**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BELINDA BURNETT,** | : | |
| | : | **Case No. 2:14-CV-2544** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Jolson** |
| **GALLIA COUNTY, OHIO,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## <u>OPINION & ORDER</u>

This matter is before the Court on Cross-Motions for Summary Judgment by Defendants Jeff Adkins, Britt Wiseman, and Gallia County, Ohio (Doc. 33) and Plaintiff Belinda Burnett. (Doc. 34.) For the following reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Partial Summary Judgment.

### I.    BACKGROUND

#### A.  Factual Background

Belinda Burnett began working in the Gallia County Prosecutor's Office (the "Prosecutor's Office") in October 2009. (Deposition of Belinda Burnett, Doc. 24 at 9.) She was the secretary for the office's IV-D contract, an agreement between the Prosecutor's Office and the Gallia County Department of Job and Family Services to fund enforcement of child support cases. (*Id.* at 9-10; Deposition of Britt Wiseman, Doc. 31 at 7-13.) Burnett was hired by Prosecuting Attorney Jeff Adkins and worked exclusively as a secretary to Assistant Prosecuting Attorney Jason Holdren from July 2010 until July 2014. (Burnett Dep., Doc. 24 at 14.) During this period, she worked alone on the first floor of the Gallia County Courthouse while the

1

remainder of the Prosecutor's Office staff worked on the second floor.  (*Id.* at 24-25.)  Burnett

prepared court documents and completed administrative and clerical tasks, but Holdren, as the

assigned attorney on the IV-D cases, was responsible for signing off on all documents and filing

them with the court.  (Deposition of Jeff Adkins, Doc. 23 at 15.)  Essentially, Burnett's task was

to process referrals from Ohio Department of Job and Family Services ("ODJFS") investigators

to the Prosecutor's Office and assist Holdren in drafting documents that he would then use in

court.  (Deposition of Linda Warner, Doc. 30 at 16.)  She also assisted in scheduling court

hearings.  (Deposition of Cynde Kuhn, Doc. 29 at 8-9.)  If Holdren had a conflict on a given

case, either Adkins, Wiseman, or another assistant prosecutor, Eric Mulford, were also

authorized to handle IV-D cases, which happened occasionally.  (Burnett Dep., Doc. 24 at 21.)

Until the events described below, Burnett had never asked the Prosecutor's Office for an

accommodation of any kind.  (*Id.* at 61.)  She had occasionally been permitted to work from

home but not for a health-related reason.  (*Id.* at 59-60.)

After Holdren was laid off in the summer of 2014, Adkins re-assigned his duties under

the IV-D contract to Assistant County Prosecutor Britt Wiseman and notified Burnett of the

change in the chain of command sometime before August 1, 2014.  (*Id.* at 20-21; Adkins Dep.,

Doc. 23 at 26-27.)  On August 4, Burnett, Adkins, and Wiseman met in Adkins' office, and

Adkins and Wiseman informed Burnett that effective immediately she was to move her office

from the first to the second floor of the courthouse.  (Burnett Dep., Doc. 24 at 26-27.)  They also

told her that instead of maintaining her current schedule of four ten-hour shifts, a schedule she

preferred in order to babysit her grandchildren on Fridays, she would shift to working from 8:00

a.m. to 4:00 p.m. five days per week.  (*Id.* at 28, 34-35; Adkins Dep., Doc. 23 at 53-54.)  Finally,

they told Burnett that she would be required to answer phones and assume additional clerical

2

duties in the Prosecutor's Office.  (*Id.* at 34; Wiseman Dep., Doc. 31 at 32.)  During the meeting, Burnett voiced her objections to these changes.  (Adkins Dep., Doc. 23 at 45, 48, 54-55.)  Adkins characterized her as "defiant" but did not recall her actually refusing to comply with any of the demands.  (*Id.* at 49-51.)  Wiseman called her reaction "disgusting" and "the worst I've seen somebody talk to their employer."  (Wiseman Dep., Doc. 31 at 41, 43.)

According to Burnett, she arrived at work on the following morning, Tuesday, August 5, 2014, at 7:00 a.m.  (*Id.* at 30.)  Rather than reporting to the second floor, she went to her first-floor office, where all her work materials were still in her old office.  (*Id.*)  Burnett stated in an affidavit she submitted after her deposition that she also went to the first floor that day because calls for the IV-D docket were still routed directly to her first floor office.  (Declaration of Belinda Burnett, Doc. 34-1 at ¶ 5.)

When Burnett arrived in the courtroom to begin the administrative tasks she usually performed there, Wiseman was already there because he was appearing in court that day.  (Burnett Dep., Doc. 24 at 31.)  He had arrived at the courthouse shortly before 8:00 a.m. and grabbed a few files for the day's cases from Burnett's desk on the second floor, then proceeded to the courtroom shortly.  (Wiseman Dep., Doc. 31 at 51, 53.)  Once in the courtroom, Wiseman acknowledged that the packed hearing schedule creates "kind of mass chaos" and does not include significant break times, so he did not speak to Burnett at any point while she was checking people in for their hearings.  (*Id.* at 57.)

At some point during the morning, Burnett began to feel "lightheaded and unsteady, nauseous."  (Burnett Dep., Doc. 24 at 31.)  She called her husband to ask him to drive her to seek medical attention and she told Cynde Kuhn, an investigator in Gallia County's Child Support Enforcement Agency, and Debra Caldwell, the magistrate's secretary, that she needed to leave

because she was sick.  (*Id.*; Kuhn Dep., Doc. 29 at 6.)  Because Wiseman and the magistrate, Linda Warner, were having a conversation, she asked Kuhn to tell Wiseman that she was leaving.  (Burnett Dep., Doc. 24 at 31.)  Kuhn characterized Burnett as flushed and with a stressed demeanor and said she appeared to be sick.  (Kuhn Dep., Doc. 29 at 13.)  Caldwell also remembered that Burnett left early because she was sick.  (Deposition of Debra Caldwell, Doc. 25 at 14-15.)

At some point less than an hour later, Kuhn announced to the court that Burnett had left due to illness.  (Kuhn Dep., Doc. 29 at 14, 16.)  Kuhn believed that Wiseman was in the courtroom when she made the announcement and that he likely heard her.  (*Id.* at 14-15.)  Wiseman, on the other hand, stated that he noticed around 10:00 or 10:30 a.m. that Burnett had left but that no one had told him why. (Wiseman Dep., Doc. 31 at 57-58.)

Burnett went to the office of Jeanne Ingles, a nurse practitioner who holds a contract with Gallia County to provide primary care services to county employees at a discounted rate.  Ingles gave Burnett a note excusing her from work for two weeks due to "illness."[1]  (Deposition of Jeanne Ingles, Doc. 27 at 19.)  Ingles testified that the reason she gave Burnett an excuse slip was that she was not able to concentrate due to her anxiety and that it was "pretty obvious she could not work like that."  (*Id.*)  Ingles often wrote the generic term "illness" on such excuse slips because patients did not want their employers to know about mental health issues due to fear of stigma.  (*Id.* at 20.)  Although she stated that she did not give Burnett the note on account of high blood pressure, she did recall that Burnett's blood pressure was higher than Ingles had ever seen it.  (*Id.*)  She encouraged Burnett to seek counseling but Burnett did not wish to do so

---

[1] The excuse slip, a pre-printed form, contained a box for Ingles to check that the excuse was due to "injury," "illness," or "other," and Ingles checked "illness."  (Doc. 23-3.)  The form did not include a space marked for elaboration on the nature of the illness.

at that time.  (*Id.* at 20-21.)  She recalled that Burnett had suffered from depression and anxiety since 2010 but until that day it had been "controlled," and that she also had a history of high blood pressure.  (*Id.* at 22-23.)

Wiseman told Adkins that Burnett had not come to the second-floor office that morning and that she had left in the middle of court.  Due to her failure to show up to work, Wiseman wanted to terminate her employment.  (Adkins Dep., Doc. 23 at 63, 66, 70.)  Adkins suggested that they wait to make that decision.  (*Id.* at 70.)  Later that afternoon, John Burnett, Plaintiff's husband, came to the Prosecutor's Office and gave Adkins the note from Ingles.  (*Id.* at 63, 67.)  Adkins did not ask him for any other documentation, and he placed the note on Wiseman's desk.  (*Id.* at 66; Wiseman Dep., Doc. 31 at 87.)  Adkins said his expectation was that Burnett would come back to work after she was no longer sick and that the three of them would be able to work out any issues.  (Adkins Dep., Doc. 23 at 70.)

Later that night, Burnett's husband brought her back to the courthouse so that she could clean out her refrigerator, which contained food that she feared would spoil during the two weeks she would be out of work.  (Burnett Dep., Doc. 24 at 49.)  She also brought home a few personal items from her office.  (*Id.* at 49-50.)

Sometime shortly after August 5, Wiseman discovered a significant backlog in the IV-D cases.  (Wiseman Dep., Doc. 31 at 72.)  He was first alerted to the problem by the magistrate, Linda Warner, and her secretary, Debra Caldwell.  (*Id.* at 104.)  He discovered that approximately 40 to 50 referrals had not been processed when he assumed responsibility for the IV-D cases.  (*Id.* at 105.)  He never discussed the cause of the backlog with Burnett because she was on leave.  (*Id.* at 73-74.)  He also did not contact Holdren to ask him about the backlog.  (*Id.* at 74.)

5

Holdren, who was not deposed in this case, later submitted an affidavit to the Court stating that: (1) Burnett had no involvement in preparing entries or signing court documents; (2) Burnett's role was to pass referrals to him and she would not take further action until after he had reviewed each of them and made a decision whether to pursue enforcement; (3) he stopped processing referrals from the enforcement agency during the early summer of 2014 because he was uncertain whether he would be continuing in his role as assistant prosecutor and wanted to allow a potential new attorney to process the referrals at his or her discretion; (4) he had several conversations with Adkins during the summer of 2014 about the backlog in entries; (5) no one contacted him after he left the Prosecutor's Office to ask about the backlog or inquire as to Burnett's responsibility for the backlog; and (6) the backlog was solely Holdren's own responsibility.  (Declaration of Jason Holdren, Doc. 34-2 at ¶¶ 1-7.)  He also submitted a letter dated September 8, 2014 stating that during his employment with the Prosecutor's Office, it was not the secretary's responsibility to draft judgment entries, magistrate decisions, magistrate decisions with notice, and final appealable orders.  (Doc. 23-2.)  The letter further stated that "during the summer of 2014, referrals from the [Child Support Enforcement] Agency were not processed as usual due to uncertainty in the IV-D contract.  This was necessary to avoid being duplicative in the paperwork, as there was uncertainty as to who would be representing the Agency in the 2014-2015 IV-D contract, and how that attorney may, or may not, want these referrals processed."  (*Id.*)

Magistrate Warner also testified that it was ultimately Holdren's responsibility to sign off on the entries, and that Burnett merely assisted him.  (Warner Dep., Doc. 30 at 31.)  Debra Caldwell testified that there was a "lull" in cases getting filed and that she "guess[ed]" that lull was "because one attorney had left and the other attorney had not started yet."  (Caldwell Dep.,

6

Doc. 25 at 9-11.)  Dana Glassburn, the director of Gallia County Job and Family Services, testified that she remembered that there was a conversation at some point about Holdren not feeling comfortable signing off on initiating cases for which he would not ultimately be responsible due to the transition, although she did not recall the details or timing of the conversation.  (Deposition of Dana Glassburn, Doc. 26 at 25-26.)  Glassburn, whose office sent the referrals to the Prosecutor's Office, stated that her office dealt directly with Burnett when handing over the referrals.  (*Id.* at 23.)  When asked directly whether she thought Burnett was responsible for the backlog, she said "I didn't look into that. That's – no."  (*Id.* at 28.)

On August 12, 2014, Burnett returned to Ingles' office and Ingles gave her a note excusing her from work for an additional two weeks.  (Ingles Dep., Doc. 27 at 24.)  Ingles testified that she wrote the second note because "her anxiety and depression was worse.  She seemed like that she was having more trouble with her family and she just – she was having issues. She was crying frequently.  She didn't feel like she could go back to work."  (*Id.*)

On August 13, 2014,  Lisa Reuter, Wiseman's mother-in-law and an employee in the Prosecutor's Office, told Ingles, as Ingles recounted it, "that the person that I have on leave I better get back to work because [Reuter] knows my contract is coming up and I may not get it renewed."  (Ingles Dep., Vol. II, Doc. 28 at 7, 12.)  Ingles stated that she felt threatened by this comment.  (*Id.* at 8.)  Wiseman and Adkins both submitted affidavits stating that they were not aware that any conversation took place between Ingles and Reuter regarding Burnett until they were so informed by defense counsel in February 2016.  (Affidavit of Britt Wiseman, Doc. 35-1 at ¶¶ 2-3; Affidavit of Jeff Adkins, Doc. 35-2 at ¶¶ 2-3.)

On August 15, 2014, ten days after her FMLA leave began, Wiseman sent a letter to Burnett informing her of the termination of her employment, effectively immediately, due to: (1)

the fact that she had not processed numerous referrals and allowed a backlog in the IV-D docket to develop; (2) she failed to prepare and submit various court orders to the Gallia County Court of Common Pleas; (3) she failed to report to work as instructed on August 5, 2014; and (4) she did not notify her supervisor prior to leaving work on August 5, 2014.  (Doc. 23-1.) Teresa Harrison, Wiseman's secretary in his private law practice, was subsequently hired to assume Burnett's duties.  (Adkins Dep., Doc. 23 at 136.)

After her termination, Burnett applied for unemployment insurance benefits from the ODJFS, which issued a Request for Information to the Prosecutor's Office, seeking further information about the nature of Burnett's discharge.  (Doc. 23-6; Wiseman Dep., Doc. 31 at 88-89.)  The Prosecutor's Office took the position that Burnett quit her job.  (Doc. 23-6 at 7.)  Gallia County stated that because the "two-week excuse fail[ed] to provide any substance as to a reason coupled with Claimant's after hours cleaning of her first floor office, there did not appear to be any bona fide illness."  (*Id.*)  In support of its contention that Burnett constructively resigned, the Prosecutor's Office cited:

> (1) Claimant's statement to Adkins/Wiseman that Claimant would not relocate to the second floor, (2) Claimant's failure to report to the second floor on August 5, 2014 as instructed, (3) Claimant leaving in the middle of court hearings on August 5, 2014, (4) Claimant cleaning out her first floor office after hours on August 5, 2014, and (5) Claimant refusing to communicate with her Employer.

(*Id.*)

On August 26, Burnett again returned to Ingles.  Ingles' notes from that visit read as follows:  "History of present illness: This 53 year old female is here stating blood pressure has improved.  She feels less anxious and feels she is ready to go back to work."  (Ingles Dep., Doc. 27 at 25.)  At that visit, Ingles felt that Burnett was not "100 percent, but she was ready to go back to work."  (*Id.* at 28.)

## B.  Procedural History

Plaintiff commenced this suit on December 4, 2014.  (Doc. 1.)  She asserted causes of action for interference in violation of the Family and Medical Leave Act ("FMLA"); discrimination in violation of the FMLA; failure to accommodate her disability in violation of Ohio Revised Code § 4112; discrimination on the basis of her disability in violation of § 4112; and age discrimination in violation of § 4112.  (*Id.* at 4-5.)  Burnett brought the FMLA claims against Defendants Adkins and Wiseman in their official capacities only.  (*Id.* at 2-3.)  She seeks reinstatement or front pay; compensatory, liquidated, and punitive damages; and attorney fees and costs.  (*Id.* at 6.)  The parties filed cross-motions for summary judgment.  (Docs. 33, 34.)

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law."  *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 340 (6th Cir. 1993).  The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992).  Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

9

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). Therefore, for purposes of Plaintiff's partial summary-judgment motion, the Court will view the facts in the light most favorable to Defendants, and in evaluating Defendants' summary-judgment motion, the Court will consider the facts in the light most favorable to Plaintiff.

### III.    ANALYSIS

Defendants have moved for summary judgment on all of Plaintiff's claims, while Plaintiff seeks summary judgment on only her two FMLA claims.

### A.  FMLA Interference

The FMLA entitles qualifying employees up to twelve weeks of unpaid leave each year if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The Sixth Circuit has recently clarified that the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to FMLA-interference claims that rest on circumstantial evidence. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). Accordingly, to establish a prima facie case on an FMLA-interference claim, a plaintiff must demonstrate that:

"(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied or interfered with the employee's FMLA benefits to which she was entitled." *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (alterations omitted) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). The burden then shifts to the defendant to "prove it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee." *Donald*, 667 F.3d at 762. The burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual, that is, that it "had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Id.* (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)); *see also Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014). If an employer "takes an employment action based, in whole or in part, on the fact that the employee took FMLA-protected leave, the employer has denied the employee a benefit to which it is entitled." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007).

The parties agree that Burnett was an eligible employee, Gallia County was an employer as defined under the FMLA, and Burnett gave notice of her intention to take leave. (Doc. 35 at 3.) Defendants contend, however, that Burnett has not shown that she had a serious health condition which would entitle her to leave or that her employer interfered with FMLA benefits to which she was entitled. (Doc. 33 at 17.)

*1. Entitlement to FMLA Leave*

Defendants argue that Burnett cannot show that she had a "serious health condition," which the FMLA defines as "an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B)

11

continuing treatment by a health care provider." 29 U.S.C. § 2611(11).  Because Burnett

received no inpatient care, she must demonstrate continuing treatment by a health care provider.

First, Defendants contend that she cannot show that she received any treatment for hypertension,

the illness that, according to her complaint, caused her need to take leave.  Second, they argue

that Jeanne Ingles, the nurse practitioner from whom she sought treatment, is not a "health care

provider" under FMLA regulations.

a.  Continuing Treatment for a Serious Health Condition

As to whether Plaintiff received continuing treatment[2] for a serious health condition,

Plaintiff asserts that she received treatment for hypertension "caused by" anxiety and depression

on August 5, 2014 and August 12, 2014.  (Doc. 34 at 12.)  In her complaint, Burnett stated that

she was "treated for a hypertensive crisis, which was related to her preexisting condition of

hypertension (high blood pressure)."  (Doc. 1 at ¶12.)  She does not mention anxiety or

depression.  In Ingles' deposition, she stated that she excused Burnett from work on August 5 not

for hypertension but, rather, anxiety and depression, although she also acknowledged that she

took Burnett's blood pressure and had discussed the measurement with Burnett because it "had

never been that high before."  (Ingles Dep., Doc. 27 at 19-20.)  On August 12, when Burnett

returned, Ingles again gave her an excuse slip for two weeks, and later testified that at that visit,

Burnett's anxiety and depression had worsened.  (*Id.* at 24.)  Because the note from Ingles

referred generically only to an "illness," and because Ingles commented on her high blood

---

[2] The FMLA's regulations define continuing treatment as "[a] period of incapacity lasting more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves . . . "[t]reatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, [or] by a nurse under direct supervision of a health care provider . . . ."  29 C.F.R. § 825.115(a).  Therefore, as Defendants do not dispute, Burnett's visits to Ingles, if she is a health care provider, are sufficient to constitute continuing treatment.

pressure, a symptom of anxiety, and also acknowledged that Burnett was at the time already taking medication for high blood pressure (*id.* at 44; Burnett Dep., Doc. 24 at 45), Burnett insists that the dispute over the nature of her health conditions is merely semantics, contending that whether she was on leave "because of hypertension or because of depression and anxiety that manifested through hypertension is immaterial." (Doc. 38 at 5 n.4.) The Court agrees.

Nor were Defendants prejudiced by Plaintiff's characterization of her serious health condition as "a hypertensive crisis" in her complaint.[3] In Ingles' first deposition on December 7, 2015, she stated that the underlying conditions causing Burnett's elevated blood pressure were depression and anxiety. (Ingles Dep., Doc. 24 at 20.) According to Plaintiff's counsel, Defendants' counsel contacted him on December 22, 2015 seeking to reopen Plaintiff's deposition in order to question her on that subject as well as her efforts to find new employment. (Declaration of Brian J. Butler, Doc. 38-1 at ¶ 2.) On January 28, 2016, Defendants' counsel re-deposed Burnett but failed to ask any further questions about her health conditions. (*See* Deposition of Belinda Burnett Vol II, Doc. 37 at 28 ("Plaintiff's counsel: You want to ask her about her medical treatment? Defendants' counsel: I don't feel like I need to.").) Because Defendants had an opportunity to question both Burnett and Ingles about Burnett's anxiety and depression, and Defendants fail to put forward any other argument that they were prejudiced, the Court finds no prejudice against Defendants in construing the serious health condition as either anxiety and depression or hypertension caused by anxiety and depression. There is no dispute of material fact that Plaintiff suffered from a serious health condition.

---

[3] In her response in opposition to Defendants' motion for summary judgment, Plaintiff asks for leave to amend her complaint to restate the nature of her serious health condition. Defendant opposes this request, contending it is too late to amend the pleadings without prejudice to Defendants. The Court **GRANTS** Plaintiff's motion for leave to amend her complaint for the sole purpose of restating her serious health condition.

b.  Health Care Provider

Defendants' second argument is that Ingles was not a health care provider.  A health care

provider is defined under the FMLA as:

> (**1**) A doctor of medicine or osteopathy who is authorized to practice medicine or surgery
> (as appropriate) by the State in which the doctor practices; or
>
> (**2**) Any other person determined by the Secretary to be capable of providing health care
> services.

29 C.F.R. § 825.125(a).  Other persons capable of providing health services include:

> Nurse practitioners, nurse-midwives, clinical social workers and physician assistants who
> are authorized to practice under State law and who are performing within the scope of
> their practice as defined under State law.

*Id.* § 825.125(b)(2).  Section (c) of the regulation defines "authorized to practice in the State" to

mean that "the provider must be authorized to diagnose and treat physical or mental health

conditions."  Defendants argue that because 29 C.F.R. § 825.125(c) requires that a provider be

authorized to make diagnoses, and Ohio Revised Code § 4723.151(a) provides that "medical

diagnosis . . . by a nurse [is] prohibited," Ingles cannot be considered a health care provider

under the FMLA.  Plaintiff quibbles with this analysis, pointing out that section (c) provides a

definition for "authorized to practice in the State" rather than "authorized to practice under State

law," the phrase in section (b)(2) that applies to nurse practitioners.  Therefore, she argues that

the clause requiring the provider to be able to make a medical diagnosis does not even apply to

nurse practitioners.  Further, Plaintiff points out that there is an explicit exception to the

prohibition on nurse diagnosis of Ohio Revised Code § 4723.151(a) in § 4723.151(b), which

provides that:

> Division (A) of this section does not prohibit a . . . certified nurse practitioner from
> practicing within the nurse's scope of practice in accordance with section 4723.43 of the
> Revised Code. Division (A) of this section does not prohibit a . . . certified nurse
> practitioner who holds a certificate to prescribe issued under section 4723.48 of the

Revised Code from prescribing drugs and therapeutic devices in accordance with section 4723.481 of the Revised Code.

In turn, Ohio Revised Code § 4723.43(C), which defines the scope of practice for nurse practitioners, provides that:

A nurse authorized to practice as a certified nurse practitioner, in collaboration with one or more physicians or podiatrists, may provide preventive and primary care services, provide services for acute illnesses, and evaluate and promote patient wellness within the nurse's nursing specialty, consistent with the nurse's education and certification, and in accordance with rules adopted by the board. A certified nurse practitioner who holds a certificate to prescribe issued under section 4723.48 of the Revised Code may, in collaboration with one or more physicians or podiatrists, prescribe drugs and therapeutic devices in accordance with section 4723.481 of the Revised Code.

Neither Plaintiff nor Defendants cite, nor has the Court found, any cases interpreting this section of the Ohio Revised Code as it applies to health care providers under the FMLA. Although courts have recognized that § 4723.151(A) prohibits "diagnosis or prescription of medical measures by a nurse," they have also recognized an exception to that rule when a nurse is following "protocol." *Kapp v. Jewish Hosp., Inc.*, No. 1:09-CV-949, 2012 WL 4483368, at *3 (S.D. Ohio Sept. 27, 2012). *See also Henricks v. Pickaway Corr. Inst.*, No. 2:08-cv-580, 2009 WL 1322306, at *4 n.6 (S.D. Ohio May 11, 2009) ("Ohio courts have held that nurses do not conduct diagnoses when they follow standing orders or protocols."); *Estate of Preston v. Kaiser Permanente*, No. 78972, 2001 WL 1382756, at *8 (Ohio Ct. App. Nov. 8, 2001). Moreover, an exception that allows a nurse practitioner to "*provide services* for acute illnesses, and *evaluate and promote patient wellness*" contemplates that a nurse could assess a patient's anxiety or hypertension and recommend treatment for an illness that has already been diagnosed, particularly when she is also permitted to prescribe drugs when working in collaboration with a physician. Ohio Rev. Code § 4723.43(C) (emphasis added)

15

Here, Ingles prescribed prescription medication for Burnett.  (Ingles Dep., Doc. 27 at 10.)
She worked under the direction of physician Kim Triplett.  (Annual Reaffirmation and
Acknowledgement of Standard Care Arrangement, Doc. 38-1 at 4.)  Burnett testified that Ingles
did not diagnose her with hypertension; rather, a doctor had previously diagnosed her as
prehypertensive in 2009 and Ingles later assumed care for her hypertension, as well as thyroid
issues and a few minor health problems.  (Burnett Dep., Doc. 24 at 48.)  Ingles also testified that
a doctor had diagnosed Burnett with anxiety before Burnett came under her care.  (Ingles Dep.,
Doc. 27 at 9-10.)

Moreover, Gallia County had a contract with Ingles to provide discounted services to
county employees, including services for "acute and chronic illness visit," and "ancillary testing
for diagnostic services."  (Doc. 38-2 at 2.)  Although this may not be strictly relevant to an
assessment of whether Ohio law allows Ingles to diagnose illnesses, it lends further support to a
finding that the scope of Ingles' practice under Ohio law allowed her to provide treatment to
Burnett and that Ingles was following protocol when she treated Burnett and gave her a note
excusing her from work.  This is especially so because if Gallia County had contracted to a nurse
practitioner to provide services for acute illness that she was prohibited from offering by Ohio
law, and then encouraged its employees to utilize those services (*see* Burnett Dep., Doc. 24 at
43), it could very well find itself in violation of the FMLA's prohibition against "manipulation
by a covered employer to avoid responsibilities under FMLA."  29 C.F.R. § 825.220(b).
Therefore, there is no dispute of material fact that Ingles was a health care provider under the
FMLA.

### 2.   Denial of or Interference with Benefits

Even conceding that Plaintiff had a serious health condition that entitled her to leave, Defendants insist that no reasonable jury could find that she was denied any benefits to which she was entitled, or that Gallia County in any way used the leave against her in an unlawful manner.

Burnett was granted FMLA leave when she requested it on August 5, 2014.  Once Wiseman discovered the backlog of cases on the IV-D docket and Burnett's role in the backlog, her employment was terminated.  Defendants argue that this discovery constituted "a legitimate reason unrelated to the exercise of FMLA rights" for terminating her.  *Edgar*, 443 F.3d at 508. *See Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) ("An employee lawfully may be dismissed, preventing [her] from exercising [her] statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.").

Burnett contends in her motion for partial summary judgment that she has presented direct evidence[4] that Gallia County used Burnett's medical leave as a negative factor in the decision to terminate her employment—which no reasonable jury could dispute—because in her termination letter Wiseman alleged that Burnett's "failure to notify your superior before vacating your responsibilities and duties in the Gallia County Juvenile Court on Tuesday, August 4, 2014" was one of the four reasons for her termination.  (Termination Letter, Doc. 23-1; *see also*

---

[4] It is unclear from Sixth Circuit precedent whether a plaintiff may also meet her burden to survive summary judgment through direct evidence, thereby obviating the need to make a prima facie case.  *See Demyanovich*, 747 F.3d at 427, 432 (noting that a plaintiff may use the *McDonnell-Douglas* burden-shifting framework for FMLA-interference claims while discussing the option of using either direct or circumstantial evidence for FMLA-discrimination claims). The Court need not decide this issue, however, because Burnett has failed to present direct evidence of interference with her FMLA benefits.

Wiseman Dep., Doc. 31 at 92.)  As additional evidence, she points to Wiseman's deposition

testimony that he believed that Burnett's medical leave and her "refusal to work out of the

second floor office" were "one in the same," (*id.* at 100-01), as well as his letter to ODJFS

opposing Burnett's application for unemployment benefits, in which he wrote:

> As a result of [Burnett's] insubordination and refusal to work out of the second floor
> office, the office of the Prosecuting Attorney was damaged, pure and simple. The
> Prosecuting Attorney's office was required to hire a part-time secretary to fill in
> Claimant's role as Claimant was refusing to work on the second floor. Claimant left
> without any notice and therefore the Prosecuting Attorney's Office was not able to hire a
> temporary replacement with legal training or experience in child support matters.

(Office of Unemployment Compensation Correspondence, Doc. 23-7.)

Viewed in the light most favorable to Defendants, Gallia County's admission that Burnett

was fired because she failed to report to work on August 5 "as specifically ordered by [her]

superior on Monday August 4, 2014" could be viewed as a failure to report to her new second-

floor office at 8:00 a.m. as she had been instructed.  (Doc. 23-1.)  And because Wiseman said he

did not recall that anyone had told him why Burnett had left and Kuhn was not certain he had

heard it either, Burnett's "fail[ure] to notify [her] superior before vacating [her] responsibilities

and duties in the Gallia County Juvenile Court on Tuesday August 5, 2014" could also be viewed

not as establishing that the medical leave itself was a factor in the eventual termination decision

but, rather, that Burnett's leaving without notice to Wiseman was a factor.  Moreover, his

testimony as to what, exactly were "one in the same" is unclear.  (Wiseman Dep., Doc. 31 at

100-01.)  Therefore, none of these statements constitutes direct evidence of FMLA interference,

and Burnett must satisfy her burden through a showing of circumstantial evidence instead.

The Court turns then to an analysis of the fifth prong of the prima facie case for FMLA

interference.  Sixth Circuit case law on this prong is somewhat murky.  In *Wysong v. Dow

Chemical Co.*, 503 F.3d 441, 447 (6th Cir. 2007), the Sixth Circuit approvingly quoted a decision

18

from this Court, *Bradley v. Mary Rutan Hospital*, 322 F. Supp. 2d 926, 940 (S.D. Ohio 2004),

which held that the fifth element of the interference-theory claim is that the employer "somehow

used the leave against her and in an unlawful manner, as provided in either the statute *or*

regulations" (emphasis in original).  In *Wysong*, the Sixth Circuit adopted this so-called

"negative-factor analysis" for interference claims, holding that the fifth element of an

interference claim is satisfied when an employer "has somehow used the leave against her and in

an unlawful manner," specifically citing 29 C.F.R. § 825.220(c), which states that "employers

cannot use the taking of FMLA leave as a negative factor in employment actions."[5]  503 F.3d at

447.  *See also Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 422 (6th Cir. 2004);

*Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir. 2003).  But in other cases, the

Sixth Circuit has also held that if an employer proves that "dismissal would have occurred

regardless of the employee's request for or taking of FMLA leave," then the plaintiff fails to

satisfy this prong.  *Arban*, 345 F.3d at 401; *see also Adams v. Auto Rail Logistics, Inc.*, 504 F.

App'x 453, 457-58 (6th Cir. 2012) ("The district court's instruction that defendants could avoid

liability 'if they prove by a preponderance of the evidence that they would have discharged Mr.

Adams even if [d]efendants had not considered Mr. Adams's absence on December 26th, 2007'

---

[5] In *Bradley*, this Court also held as follows:

> In order to prevail on her [interference] claim, therefore, [plaintiff] need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her. She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both. No scheme shifting the burden of production back and forth is required.

322 F. Supp. 2d at 938 (quoting *Schmauch v. Honda of Am. Mfg., Inc.*, 295 F. Supp. 2d 823, 831 (S.D. Ohio 2003)).  It is unclear, however, whether the Sixth Circuit has adopted this precise analysis and, in fact, future Sixth Circuit decisions have used the burden-shifting framework when analyzing FMLA-interference claims that rely on circumstantial evidence.  *See, e.g.*, *Damyanovich*, 747 F.3d at 432.

is another way of saying that defendants are not liable under the FMLA if they prove that the dismissal 'would have occurred regardless of the employee's request for or taking of FMLA leave.'") (quoting *Arban*, 345 F.3d at 401).

At the summary-judgment stage, however, it is sufficient for the plaintiff to show that "a termination [was] based only in part on an absence covered by the FMLA, even in combination with other absences." *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 726 (6th Cir. 2003), *superseded by statute as stated in Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014). Even though Defendants have presented evidence that they terminated Burnett due to her role in the backlog of IV-D cases, she has met her burden to introduce evidence that her FMLA leave was a negative factor in her termination.  In particular, Holdren's affidavit, as well as corroborating testimony from other employees, indicates that Burnett may not have even been responsible for the backlog, because Holdren was intentionally declining to initiate cases due to his impending departure date and, in any case, as the IV-D secretary she was not ultimately responsible for signing off on court documents.  Furthermore, there is testimony in the record from other employees of the Prosecutor's Office that Burnett performed her job competently. (*See* Kuhn Dep., Doc. 29 at 9; Warner Dep., Doc. 30 at 17.)

Because there is a factual dispute regarding interference with FMLA benefits, summary judgment for either party is not appropriate.  The Court **DENIES** Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Partial Summary Judgment on the FMLA-interference claim.

## B.  FMLA Discrimination

In addition to an FMLA-interference claim, a plaintiff may recover under the FMLA for discrimination, also known as retaliation.  A plaintiff may prove such a claim using either direct

or indirect evidence. *Demyanovich*, 747 F.3d at 432.  If the employee presents direct evidence that the employer acted with discriminatory motive, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Id.* (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002)).  Direct evidence constitutes evidence that, "if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 829 (6th Cir. 2000) (citation omitted).

Burnett again argues that she has set forth direct evidence of retaliation, namely, Wiseman's testimony that his decision to terminate her was motivated, at least in part, by her taking FMLA leave.  (Doc. 38 at 12.)  But viewed in the light most favorable to Defendants, a reasonable jury could believe Wiseman's testimony that her termination "had nothing to do with her being ill or anything of that sort" and that he took into account not her FMLA leave but her decision not to report to the second-floor office and to leave the building without notifying her supervisors.  (Wiseman Dep., Doc. 31 at 91.)  Accordingly, for the same reasons that the Court found that this evidence does not constitute direct evidence of interference with FMLA benefits, the Court also concludes that it is not direct evidence of retaliation.  Accordingly, the Court denies Burnett's motion for partial summary judgment and proceeds to consider her circumstantial evidence of discrimination.  *See DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009) ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by [discrimination].").

If a plaintiff presents only circumstantial evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies.  *See Demyanovich*, 747 F.3d at 432; *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).  A plaintiff first bears the burden to make out a prima facie case of FMLA retaliation by showing that:  "(1) she availed herself of a protected right under the FMLA by notifying [the employer] of her intent to take leave, (2) she suffered an adverse employment action, and (3) . . . there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action."[6] *Edgar*, 443 F.3d at 508.  Once the employee satisfies these three requirements, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee."  *Id.*  The plaintiff must then rebut the defendant's legitimate nondiscriminatory reason for termination by pointing to evidence that the reason was pretextual.  *See Demyanovich*, 747 F.3d at 433.

Defendants do not dispute that Burnett has met the three prongs of the prima facie case, but because they have set forth a legitimate, nondiscriminatory reason for her termination, they contend that Burnett's FMLA-discrimination claim fails.  They have indeed offered such a reason, namely that Burnett was responsible for the backlog of cases on the IV-docket, but their argument ends there.  They fail to consider Sixth Circuit case law that allows a plaintiff to show

---

[6] Some other Sixth Circuit cases have defined the FMLA-retaliation prima facie case slightly differently.  For instance, in *Demyanovich*, the court held that an employee establishes a prima facie case of retaliation by showing that: "1) he engaged in protected activity, (2) his employer was aware of the protected activity, (3) he was subject to an adverse employment action, and (4) there was a causal nexus between the protected activity and the adverse employment action." 747 F.3d at 432-33.  *See also Donald*, 667 F.3d at 761; *Killian v. Yorozu Auto. Tenn. Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).  But the prong requiring notice to the employer of an intent to take FMLA leave essentially restates the first two prongs as conceived in *Demyanovich* and other cases and in any event, Defendants do not contest the notice prong here.  Therefore, the slight distinction between the two formulations of the prima facie case is immaterial to the Court's analysis here.

that a legitimate nondiscriminatory reason for termination is pretextual.  *See Demyanovich*, 747 F.3d at 433; *Skrjanc*, 272 F.3d at 315.

This purported legitimate reason for Burnett's termination is the same one that Defendants offered in response to her FMLA-interference claim and, as discussed above, Burnett has offered evidence from which a reasonable jury could conclude that this reason was pretextual.  *See Demyanovich*, 747 F.3d at 433.  In addition, the temporal proximity of her termination to the initiation of her FMLA leave constitutes evidence of pretext.  Burnett was notified of her termination only ten days after she began her FMLA leave.  The Sixth Circuit has held that although it is "insufficient in and of itself to establish" pretext, temporal proximity can be evidence of pretext.  *Skrjanc*, 272 F.3d at 317.  Because Plaintiff has offered evidence of temporal proximity as well as other evidence that Defendants' proffered legitimate nondiscriminatory reason for her termination  was pretextual, the Court **DENIES** Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Partial Summary Judgment on the FMLA-retaliation claim.

### C.  Disability Discrimination

Courts evaluate claims under Ohio Revised Code § 4112 using the same legal analysis as such claims arising under the Americans with Disabilities Act ("ADA").  *Brenneman*, 366 F.3d at 418; *Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 n.2 (6th Cir. 2000).  An employer is prohibited from denying employment opportunities to an employee with a disability "if the denial is based upon the employer's need 'to make reasonable accommodation to the physical or mental impairments of the employee.'"  *Brenneman*, 366 F.3d at 417 (quoting 42 U.S.C. § 12112(b)(5)(B)).  Burnett brings one claim under § 4112 for failure

to accommodate and another for disability discrimination.  Because both claims share many of the same elements, the Court will evaluate them in conjunction.

To establish a prima facie case for a failure-to-accommodate claim, a plaintiff must show: (1) she is disabled; (2) she was qualified for the position; (3) the employer was aware of her disability; (4) an accommodation was needed, that is, a causal relationship existed between the disability and the request for accommodation; and (5) the employer failed to provide the necessary accommodation.  *DiCarlo*, 358 F.3d at 419.  Once this showing is made, "the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs." *Id.* (citation omitted).  If the employer meets this burden of production, the plaintiff must introduce evidence to show that the proffered explanation is pretextual.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185-86 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 314-15 (6th Cir. 2012) (en banc).

To establish a prima facie case of disability discrimination, a plaintiff must show: (1) she has a disability; (2) she is otherwise qualified for the position with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) her employer knew or had reason to know of her disability; and (5) her position remained open or a new hire was made to fill the position.  *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 449 (6th Cir. 1999).  After the plaintiff makes out a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse action.  *Brohm v. JH Props., Inc.*, 149 F.3d 517, 520-21 (6th Cir. 1998).  Once the employer has met this burden, the burden shifts back to the employee to "offer evidence that the proffered reason was in fact a pretext designed to mask discriminatory intent."  *Id.* at 521.

24

Defendants do not dispute that Burnett was qualified for her position, requested an accommodation in the form of a two-week leave, suffered an adverse employment action, and was replaced by another employee. They contend that Burnett has failed to establish that she is disabled, that Adkins knew of the disability, and that she was not provided a necessary accommodation. (Doc. 33 at 26.) Therefore, they argue that she cannot succeed on either of her disability-related claims.

Plaintiff argues that her hypertension, anxiety, and depression are disabilities and that Gallia County knew or had reason to know that she had those disabilities. (Doc. 38 at 16.) The definition of disability under the ADA, pursuant to the 2008 amendments to the Act, includes "[a]n impairment that is episodic or in remission . . . if it would substantially limit a major life activity when active" and "without regard to the ameliorative effects of" medication. 42 U.S.C. § 12102(4)(D)-(E). Moreover, the 2008 amendments provided that "[t]he definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this chapter." *Id.* § 12102(4)(A). *See Jenkins v. Nat'l Bd. of Med. Examiners*, No. 08-5371, 2009 WL 331638, at *4 (6th Cir. Feb. 11, 2009) (vacating district court's non-disability finding for a medical student with a reading disorder and remanding for new determination in light of 2008 amendments). Further, the implementing regulations of the 2008 amendments provide that "[t]he operation of a major bodily function, including . . . circulatory . . . functions" is a major life activity. 42 C.F.R. § 12102(2)(B).

All of the case law Defendants cite for the proposition that Plaintiff's condition was insufficient to show a disability was issued before the 2008 Amendments and the Court thus finds it inapposite. *See, e.g.*, *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002), *superseded by statute*, Pub. L. No. 110-325 (2009); *Myers v. Cuyahoga Cnty.*, 182 F. App'x 510,

515 (6th Cir. 2006) (holding a plaintiff was not disabled when her treating physician stated that her depressive symptoms were well controlled with medication and she was able to work).  The Sixth Circuit has not weighed in directly on whether an impairment similar to Burnett's constitutes a disability under the 2008 amendments, but in her opposition to Defendants' motion for summary judgment, Plaintiff points to a Seventh Circuit case, *Gogos v. AMS Mechanical Sys., Inc.*, holding that a plaintiff's "episode of a blood-pressure spike and vision loss are covered disabilities" when after several years of taking blood-pressure medication, his pressure spiked one day at work and he notified his supervisor that he needed to leave to go to the hospital.  737 F.3d 1170, 1173 (7th Cir. 2013) (per curiam).  The Seventh Circuit concluded that the plaintiff's high blood pressure and intermittent blindness "substantially impaired two major life activities: his circulatory function and eyesight."  *Id.* (citing 42 U.S.C. § 12102(2)).  The court went on:

> Moreover, [plaintiff] alleged chronic blood-pressure condition—for which he has taken medication for more than eight years—could also qualify as a disability. The amended ADA provides that when "determin[ing] whether an impairment substantially limits a major life activity[,] the ameliorative effects of mitigating measures such as ... medication" are not relevant. 42 U.S.C. § 12102(4)(E)(i)(I).The interpreting regulation explains the new law by way of an example directly on point here: "[S]omeone who began taking medication for hypertension before experiencing substantial limitations related to the impairment would still be an individual with a disability if, without the medication, he or she would now be substantially limited in functions of the cardiovascular or circulatory system." 29 C.F.R. Pt. 1630, App. at Section 1630.2(j)(1)(vi). Thus, even if [plaintiff] had not experienced the episode of elevated blood pressure and vision loss, he could qualify as disabled due to his chronic blood-pressure condition.

*Id.*

Here, too, Burnett had taken blood pressure medication for hypertension and her blood pressure spiked while she was at work.  Moreover, depression and anxiety are disabilities within the meaning of the ADA, as they substantially limit major life activities.  *See* 29 C.F.R. § 1630.2(h)(2); *Wolffram v. Sysco Cincinnati, LLC*, No. 1:12-cv-961, 2015 WL 2383460, at *7

(S.D. Ohio May 19, 2015).  Because Burnett has introduced evidence that she suffered from the disabilities of hypertension, depression, and anxiety, she satisfies this prong of the prima facie case.  *See also Green v. Teddie Kossof's Salon & Day Spa*, No. 13-C-6709, 2015 WL 5675463, at *4 (N.D. Ill. Sept. 24, 2015) ("[Plaintiff's] testimony indicates that her ovarian cyst, though transitory, substantially limited her performance of major life activities. That is sufficient to defeat [Defendant's] motion for summary judgment with respect to this element."); *Martinez v. Univ. Med. Ctr.*, No. 2:13-cv-00003, 2015 WL 315708, at *6 (D. Nev. Jan. 26, 2015) ("By failing to address the 2008 amendments, [defendant] has not met its initial burden of establishing [plaintiff] was not covered by the ADA at the time of the December 1 incident due to a temporary injury.").

As to whether her employer knew of the disability, this is a closer question.  It is undisputed that Burnett had not previously taken time off of work for problems related to her hypertension.  (Burnett Dep., Doc. 24 at 61.)  There are two pieces of evidence, however, that Adkins knew about Burnett's hypertension, anxiety, or depression.  First, Plaintiff testified in her deposition that she had not told Wiseman about her hypertension but she had told Adkins:  "We talked about it on different occasions because of our age, and problems that come up with age, and his shoulder, his wife's shoulder.  Just random."  (Burnett Dep., Doc. 24 at 61.)  Second, Burnett's husband, John Burnett, also submitted an affidavit, attesting that when he dropped off Ingles' letter to Adkins on the afternoon of August 5, he told Adkins "that Belinda was unable to work due to her really high blood pressure.  Adkins responded that his wife had had a similar problem."  (Declaration of John Burnett, Doc. 34-3 at ¶ 2.)  In his deposition, Adkins said that he did not recall John Burnett telling him that Plaintiff had hypertension.  (Adkins Dep., Doc. 23 at 66.)  He said that Burnett's husband only handed him the note and said, "Here's an excuse,"

although he also acknowledged it was possible that John Burnett mentioned hypertension.  (*Id.* at 65, 93.)  It does not appear that Adkins was questioned in his deposition about whether he knew about Burnett's hypertension, anxiety, or depression before the day she went on FMLA leave.

Given the conflicting evidence regarding Adkins' knowledge of Burnett's disabilities, the Court finds that there is a genuine issue of material fact on this prong of the prima facie case. This is especially so given that, as the Third Circuit has held, "to trigger the [defendant's] duty to participate in the interactive process, it is not essential that [the defendant] knew the specific name of [the plaintiff's] condition." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 314 (3d Cir. 1999).  The Sixth Circuit has also addressed the related issue of when the sudden onset of mental illness may put an employer on notice of an employee's disability, citing *Taylor* for the proposition that an employer can be on notice of a disability when it has knowledge of hospitalization and sudden onset of extreme symptoms. *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 737-38 (6th Cir. 2015).  And even though there is no evidence that Adkins or Wiseman knew about Burnett's anxiety or depression, evidence that they knew about her limitations, such as the hypertension, that arose from that disability is sufficient to survive summary judgment. *See Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996) ("For purposes of proving ADA discrimination, it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability. The distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities."). Plaintiff has shown a genuine dispute of material fact as to the employer-knowledge prong of the prima facie case on her disability-discrimination claims.

The last remaining issue on which Defendants assert they are entitled to summary judgment is whether Burnett was given a necessary accommodation.  Because she was terminated when the two-week leave was not yet complete, Burnett argues that it is beyond dispute that she was not given her requested accommodation.  (Doc. 38 at 18.)  Defendants, on the other hand, contend that they provided the requested accommodation by granting FMLA leave to Burnett before eventually firing her.  (Doc. 33 at 28-29.)  Given that Plaintiff was fired before her FMLA leave had concluded, Defendants' argument is without merit.

Having concluded that Plaintiff can make a prima facie showing on both her failure-to-accommodate claim and her disability-discrimination claim, the burden shifts to Defendants on both claims:  on the failure-to-accommodate claim, Defendants must offer an explanation for why Plaintiff's requested accommodation—her FMLA leave—imposes an "undue hardship" on Defendants.  *DiCarlo*, 358 F.3d at 419.  Defendants have offered no such explanation and, therefore, are not entitled to summary judgment on the failure-to-accommodate claim.

On the disability-discrimination claim, Defendants bear the burden on offering a legitimate nondiscriminatory reason for Burnett's termination.  *Brohm*, 149 F.3d at 520-21.  Once they have done so, the burden shifts back to the employee to "offer evidence that the proffered reason was in fact a pretext designed to mask discriminatory intent."  *Id.* at 521.  Defendants have met that burden, proffering the nondiscriminatory explanation that Burnett was terminated because she failed to process referrals or notify other staff members that IV-D cases were backlogged.  Plaintiff may demonstrate pretext by introducing evidence to show that the proffered reasons: "(1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) were insufficient to motivate the employer's action."  *Harris v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).

As evidence that this explanation was pretextual, Burnett argues that "a reasonable juror could doubt" Adkins' explanation that Burnett was fired for failure to process the IV-D referrals because "there is considerable evidence that the IV-D backlog was fully attributable to Holdren, and that Burnett put forth considerable effort to put others on notice of the problem."  (Doc. 38 at 19.)  She also cites Wiseman's admission that he terminated Burnett in part for leaving work without notifying him.  (*Id.*)  Essentially, she suggests that the proffered nondiscriminatory reason did not actually motivate or was insufficient to motivate Defendants' decision to terminate her.  This evidence of pretext is sufficient for Burnett to satisfy her burden to rebut Defendants' proffered nondiscriminatory reason for her termination.

The Court, therefore, **DENIES** Defendants' Motion for Summary Judgment on Plaintiff's § 4112 failure-to-accommodate and disability-discrimination claims.

### D.  Age Discrimination

Ohio Revised Code § 4112.02(A), in relevant part, prohibits an employer from discharging or otherwise discriminating against any individual because of her age.  Plaintiff concedes that she has not introduced direct evidence of disparate treatment on the basis of her age.  Therefore, the Court applies the *McDonnell Douglas* burden-shifting framework.  *Mitchell*, 964 F.2d at 582.  Although *McDonnell Douglas* was a Title VII race-discrimination case, the Court analyzes Ohio-law discrimination claims under the same analytical framework as Title VII discrimination claims.  *Id.*

First, a plaintiff must make a prima facie case of age discrimination by showing that:  (1) she was at least 40 years old at the time of the alleged discrimination; (2) she was subjected to an adverse employment action; (3) she was qualified for the job; and (4) she was replaced by a substantially younger employee or, for the same or similar conduct, was treated differently from

30

a substantially younger employee.  *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003); *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004).

If a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action.  *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).  After the defendant meets its burden, the plaintiff must then demonstrate that the defendant's explanation was pretext for discrimination.  *Id.*  Plaintiff bears the ultimate burden of persuasion to prove by a preponderance of the evidence that age was the "but-for" cause of her termination.  *Gross*, 557 U.S. at 177-78.

It is undisputed that Plaintiff has established a prima facie case of age discrimination because she has shown that she was at least 40 years old, she was qualified for her position, her employment was terminated, and she was replaced by a substantially younger employee. Defendants have proffered a legitimate nondiscriminatory reason for her termination, namely, that for four months she failed to process referrals or notify anyone in the Prosecutor's Office that IV-D cases were not being completed.  (Doc. 33 at 30-31.)

Plaintiff devotes a mere three sentences to her response to Defendants' motion for summary judgment on her age-discrimination claim, cursorily asserting that "a reasonable juror could find that [the] asserted justification for her termination is pretextual."  (Doc. 38 at 19-20.) She does not point, however, to a shred of evidence from which the jury could find pretext. Because it is Plaintiff's burden to "rebut . . . the defendant's proffered rationale," *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012), and she has identified no evidence that could support an inference that she was fired because of her age, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's § 4112.02(A) claim.

## IV.    CONCLUSION

For the foregoing reasons, Court **DENIES** Plaintiff's Motion for Partial Summary Judgment on her FMLA-interference and FMLA-retaliation claims (Doc. 34) and **GRANTS in part** and **DENIES in part** Defendants' Motion for Summary Judgment.  (Doc. 33.) Specifically, the Court **GRANTS** Defendants' Motion for Summary Judgment on the age-discrimination claim and **DENIES** Defendants' Motion for Summary Judgment on the three remaining claims.  The Court also **GRANTS** Plaintiff leave to amend her complaint within fourteen (14) days to clarify the nature of her serious health condition.

**IT IS SO ORDERED.**

    **s/ Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  September 12, 2016**